Filed 2/24/22

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| ANNA VON HERRMANN,<br><br>        Petitioner,<br><br>        v.<br><br>THE SUPERIOR COURT OF IMPERIAL COUNTY,<br><br>        Respondent;<br><br>MANAGEMENT & TRAINING CORPORATION,<br><br>        Real Party in Interest. | D079157<br><br><br>(Imperial County<br>Super. Ct. No. ECU001031) |

ORIGINAL PROCEEDINGS in mandate.  L. Brooks Anderholt, Judge. Petition granted.

Law Office of Abenicio Cisneros and Abenicio Cisneros for Petitioner.

Burke, Williams & Sorensen, Susan E. Coleman and Mark J. Austin for Real Party in Interest.

No appearance for Respondent.

The California Public Records Act (CPRA) generally applies only to government agencies.  (Gov. Code, § 6250 et seq.)  However, with respect to facilities that detain noncitizens as they await federal civil immigration

proceedings, the Legislature enacted Civil Code section 1670.9, which provides (in part) that "[a]ny facility that detains a noncitizen pursuant to a contract with a city" is subject to the CPRA. (Civ. Code, § 1670.9, subd. (c).)[1] We consider here whether, under section 1670.9(c), the CPRA applies to a private entity that operates an immigration detention facility, even when the operator is not a direct party "to a contract with a city." (§ 1670.9(c).)

The U.S. Immigration and Customs Enforcement agency (ICE) entered into a contract with the City of Holtville (City) to detain noncitizens at the Imperial Regional Detention Facility (Facility). The City did not own the Facility, so the City subcontracted its detention responsibilities to the Facility's owner. The owner did not operate the facility, so the owner subcontracted its responsibilities (with ICE's approval) to a private operator, real party in interest Management & Training Corporation (Operator).

Petitioner Anna Von Herrmann (Petitioner) served the Operator with a CPRA request regarding the Facility. Operator refused to comply, reasoning it was not subject to the CPRA because it did not have a contract directly with the City, and, thus, the Facility was not one that "detains a noncitizen *pursuant to a contract with a city*." (§ 1670.9(c), italics added.) Alternatively, Operator maintained several CPRA exemptions applied. Petitioner sought a writ of mandate from the trial court compelling Operator to comply with the CPRA request, but the court agreed with Operator's interpretation of section 1670.9(c) and denied the petition without reaching Operator's CPRA exemption claims.

---

[1] Further undesignated statutory references are to the Civil Code. We will refer to section 1670.9, subdivision (c) as "section 1670.9(c)," and will sometimes refer to a "facility that detains a noncitizen" (§ 1670.9(c)) as an "immigration detention facility."

Petitioner contends the trial court construed section 1670.9(c) too narrowly as applying the CPRA only to an entity that contracts directly with a city to detain noncitizens.  We agree.  As we will explain, the plain meaning of section 1670.9(c), and the structure of section 1670.9 as a whole, indicate the Legislature intended for the CPRA to apply to immigration detention facilities on a *facility-wide* basis rather than an *entity-specific* basis.  Accordingly, we will issue a writ of mandate directing the trial court to vacate its order denying the petition and to enter a new order granting it, subject to resolution of Operator's CPRA exemption claims.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  The Facility and Related Entities and Contracts

The Facility is an immigration detention facility in Calexico.

The Facility was constructed and is privately owned by Imperial Valley Gateway Center, LLC (Owner).

Effective September 12, 2014, ICE and the City entered into a contract (the ICE–City Contract) under which the City agreed to "provide detention services for detainees" at the Facility as they awaited federal administrative immigration proceedings.[2]  It appears from the appellate record that the ICE–City Contract terminated on September 21, 2019.

The ICE–City Contract allowed the City, with ICE's approval, to "subcontract[ ] the detention and care of detainees to another entity."  In such

---

[2]    The ICE–City Contract is formally known as "EROIGSA-14-0002 Intergovernmental Services Agreement Between the United States Department of Homeland Security U.S. Immigration and Customs Enforcement Office of Enforcement and Removal Operations and City of Holtville."  The parties refer informally to this contract in their briefing as the "IGSA."  For simplicity and to distinguish it from other relevant contracts, we refer to it as the ICE–City Contract.

3

an event, the contract provided that ICE would deem the new entity a subcontractor, and the subcontractor would be "subject to the terms and conditions of" the ICE–City Contract.

The City has never owned, operated, or managed the Facility. Consequently, the City and Owner entered into a contract (the City–Owner Contract) under which Owner agreed to detain detainees at the Facility. The City–Owner Contract is not itself in the appellate record, but Operator's trial counsel and the City's City Manager acknowledged it exists.[3]

---

[3] Operator's trial counsel wrote the following in an email to Petitioner's trial counsel: "[Owner] owns the detention facility. *The City . . . contracts with [Owner] to house the detainees*, the City has an [intragovernmental service agreement] with ICE. [Operator] is not a party to the [ICE–City Contract] and we do not have a copy of this document. [Owner] only owns the property and doesn't manage detention facilities so it contracted with [Operator] in 2014 to operate the facility." (Italics added.)

The City Manager attested to the following in a trial court declaration: "I am informed and believe that the City . . . , [in] or about May, 2014, entered into a Inter Governmental Service Agreement (IGSA) to provide for the care and custody of detainees in the custody of [ICE]. *That responsibility was subcontracted and delegated to [Owner] as the owner of the facility*, and from them to [Operator]. The City . . . has no contractual relationship or agreements with [Operator]. Furthermore, its involvement in the [Facility] under the [ICE–City Contract] expired in September 21, 2019." (Italics added.)

Although Operator correctly observes the City Manager made this declaration on information and belief, he explained in his declaration the foundation for his conclusions: "I am the City Manager, as well as interim City Clerk, for the City . . . . I have been City Manager from September 29, 2014 to present. Prior to that, I served as the Finance Manager for the City . . . from July 1, 2011 to September 29, 2014. [¶] As a result of my varied responsibilities throughout my employment with the City . . . , I am extremely familiar with the city's record keeping practices as well as contractual relationships with other public agencies and third party vendors."

Owner does not operate the Facility. Instead, from June 2013 through September 22, 2019, Operator operated the Facility under a contract with Owner (the Owner–Operator Contract).[4] Operator acknowledged in its return to the petition that, to "be permitted to operate the Facility," Operator "sought and obtained the approval of ICE." Operator's submissions to ICE included cost information provided by the City. The Owner–Operator Contract required Operator to "operate, maintain, and manage the Facility in accordance with all Operating Standards," which the contract defined to "include the terms and conditions of" the ICE–City Contract, a complete copy of which was attached to the Owner–Operator Contract.

The Owner–Operator Contract also required Operator to "use its best efforts to pursue Governmental Housing Agreements," which the contract defined as agreements between other governmental entities and the City, "who then subcontracted to [Owner] to have . . . Detainees housed at the Facility." Operator then "assumed" all of Owner's responsibilities under such agreements "in connection with the housing of detainees/offenders." The Owner–Operator Contract gave Operator the right to approve the terms of Governmental Housing Agreements, and to direct Owner to "cause the City . . . to execute" such agreements.

After the Owner–Operator Contract terminated in September 2019, Operator contracted directly with ICE to operate the Facility.

---

4 The Owner–Operator Contract is formally known as the "Amended and Restated Operations, Management, and Maintenance Agreement for the Imperial Regional Detention Facility between Management & Training Corporation and Imperial Valley Gateway Center, LLC." For simplicity and clarity, we refer to it as the Owner–Operator Contract. At our request, Operator submitted a copy of this contract as an exhibit to a declaration accompanying Operator's return to the petition.

Operator has never had a contract *directly with the City* to detain noncitizens at the Facility.

## B. The CPRA Request

In January 2019, while Operator was still operating the Facility under the Owner–Operator Contract, Petitioner served on Operator a CPRA request seeking various records relating to the Facility dating back to 2014. The request sought the following:

> "1. Copies of [Operator]'s contracts with the [C]ity . . . and with [ICE] for the [Facility].
>
> "2. Any reports from the US Department of Homeland Security's Office of Inspector General (or its contractors) regarding the [Facility].
>
> "3. Any communications . . . between anyone at the [Facility] and anyone at DHS's Office of Inspector General (or its contractors).
>
> "4. Any reports from the California Department of Justice regarding the [Facility].
>
> "5. Any communications . . . between anyone at the [Facility] and anyone at the California Department of Justice.
>
> "6. Any records of or related to complaints against any employees or other staff at the [Facility]."

Operator believed it was not subject to the CPRA and informed Petitioner she should submit her request to the federal government under the federal Freedom of Information Act. Operator did not produce any records in response to Petitioner's request.

## C. Trial Court Proceedings

Petitioner filed a petition for writ of mandate in the trial court seeking to compel Operator to produce the requested records.[5] She asserted that Operator was subject to the CPRA under section 1670.9(c) because the Facility detained noncitizens pursuant to the ICE–City Contract. Petitioner mistakenly alleged the City owned the Facility and contracted directly with Operator.

In opposition, Operator argued it was not subject to the CPRA because Operator had no direct contract with the City. Alternatively, Operator maintained that even if the CPRA applied, Operator either had no responsive documents, or any responsive documents were covered by a CPRA exemption.

After a hearing, the trial court denied the petition. The court agreed with Operator that section 1670.9(c) did not apply to the Facility because there was no direct contract between Operator and the City. The court did not address Operator's alternative arguments.

## D. Proceedings in This Court

Petitioner filed a petition in this court seeking a writ of mandate directing the trial court to vacate its order denying her petition, and to enter a new order finding the CPRA applies to Operator with respect to the Facility. At our request, Operator filed an informal response.

We then issued an order to show cause "why the relief sought in the petition should not be granted." We also directed the parties "to explain the relationship between [Operator], the City . . . , and [Owner]" with respect to the Facility, and to provide copies of pertinent agreements.

---

[5]  Petitioner also sought to compel the City to produce records requested under a separate CPRA request to the City. This aspect of her petition is not at issue here.

7

Operator filed a return to the petition.  Regarding our request for copies of the agreements, Operator (1) confirmed that the ICE–City Contract was included in Petitioner's appendix; (2) represented that it did not possess, nor was it "aware of ever having" possessed, the City–Owner Contract; and (3) produced a copy of the Owner–Operator Contract, which included the ICE–City Contract as an attachment.

Petitioner filed a reply.

## II.  DISCUSSION

### A.  Legal Principles

#### 1.  The CPRA

"The [CPRA] and the California Constitution provide the public with a broad right of access to government information.  [Citation.]  The [CPRA], enacted in 1968, grants access to public records held by state and local agencies.  ([Gov. Code], § 6250 et seq.)  Modeled after the federal Freedom of Information Act (5 U.S.C. § 522 et seq.), the [CPRA] was enacted for the purpose of increasing freedom of information by giving members of the public access to records in the possession of state and local agencies.  [Citation.]  Such 'access to information concerning the conduct of the people's business,' the Legislature declared, 'is a fundamental and necessary right of every person in this state.' " (*Los Angeles County Bd. of Supervisors v. Superior Court* (2016) 2 Cal.5th 282, 290 (*Los Angeles County Bd. of Supervisors*); see *Voice of San Diego v. Superior Court of San Diego County* (2021) 66 Cal.App.5th 669, 683 (*Voice of San Diego*).)

In 2004, voters passed Proposition 59, which "enshrined the [CPRA]'s right of access to information in the state Constitution." (*Los Angeles County Bd. of Supervisors, supra,* 2 Cal.5th at p. 290; see *City of San Jose v. Superior Court* (2017) 2 Cal.5th 608, 615 (*City of San Jose*); *Voice of San Diego, supra,*

8

66 Cal.App.5th at p. 683.) "A provision added by Proposition 59 states: 'The people have the right of access to information concerning the conduct of the people's business, and, therefore, . . . the writings of public officials and agencies shall be open to public scrutiny.' (Cal. Const., art. I, § 3, subd. (b)(1).)" (*City of San Jose*, at p. 615; see *Los Angeles County Bd. of Supervisors*, at p. 290; *Voice of San Diego*, at p. 683.) "As amended by the initiative, the Constitution also directs that statutes 'shall be broadly construed if it furthers the people's right of access, and narrowly construed if it limits the right of access.' (Cal. Const., art. I, § 3, subd. (b)(2).)" (*Los Angeles County Bd. of Supervisors*, at pp. 290-291; see *Voice of San Diego*, at p. 683.)

## 2. Section 1670.9

In an effort to regulate detention facilities that house noncitizens as they await federal immigration proceedings, the Legislature added section 1670.9 to the Civil Code (effective January 1, 2018). (Stats. 2017, ch. 494, § 2.)

At issue here, section 1670.9(c) extends the CPRA to immigration detention facilities as follows:

> "Any facility that detains a noncitizen pursuant to a contract with a city, county, city and county, or a local law enforcement agency is subject to the California Public Records Act (Chapter 3.5 (commencing with Section 6250) of Division 7 of Title 1 of the Government Code)."

The remaining subdivisions of section 1670.9 impose new contracting restrictions and new notice and hearing requirements regarding certain local government actions involving immigration detention facilities. (See § 1670.9, subds. (a), (b), (d) [quoted in full in fns. 7-9, *post*].)

9

### 3. Standard of Review

" 'When we interpret a statute, "[o]ur fundamental task . . . is to determine the Legislature's intent so as to effectuate the law's purpose. We first examine the statutory language, giving it a plain and commonsense meaning. We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment. If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy." [Citation.] "Furthermore, we consider portions of a statute in the context of the entire statute and the statutory scheme of which it is a part, giving significance to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose." ' " (*City of San Jose*, *supra*, 2 Cal.5th at pp. 616-617.)

"In CPRA cases, this standard approach to statutory interpretation is augmented by" Proposition 59's "constitutional imperative" that a statute " 'be *broadly* construed if it furthers the people's right of access, and narrowly construed if it limits the right of access.' " (*City of San Jose, supra*, 2 Cal.5th at p. 617, quoting Cal. Const., art. I, § 3, subd. (b)(2).)

### B. Analysis

Whether the CPRA applies to Operator in relation to the Facility hinges on what it means for a "facility [to] detain[ ] a noncitizen pursuant to a contract with a city." (§ 1670.9(c).) Petitioner—focusing on the word "facility"—contends the Legislature intended the CPRA to apply on a facility-wide basis such that "any entity engaged in the business of detention" of

10

noncitizens "at [a] [f]acility would be subject to the CPRA."  Operator—
focusing on the phrase "pursuant to a contract with a city"—contends the
Legislature intended the CPRA to apply on an entity-specific basis such that
only "the specific entity that contracted with [a] local agency" for the
detention of noncitizens at a facility (or, alternatively, "the owner of the
facility itself, [and] not one of its occupants or even an operator") would be
subject to the CPRA.[6]  We conclude the Legislature intended the CPRA to
apply on a facility-wide basis such that Operator is subject to Petitioner's
request.

To support our conclusion, we need look no further than the plain
language of section 1670.9, as a whole.  (See *City of San Jose*, *supra*,
2 Cal.5th at p. 617 [" ' "we consider portions of a statute in the context of the
entire statute and the statutory scheme of which it is a part" ' "].)  Three of
section 1670.9's four subdivisions—that is, all but subdivision (c)—operate on
an entity-specific basis.  Subdivision (a) restricts local governments from
entering into new contracts "with the federal government or any federal
agency or a private corporation to house or detain noncitizens."  (§ 1670.9,
subd. (a).)[7]  Subdivision (b) restricts local governments from expanding the

---

[6]    Operator contends the factual errors in Petitioner's trial court
petition—that the City owned the Facility and contracted directly with
Operator—"reveal Petitioner's own apparent interpretation of Section
1670.9(c)" is the same as Operator's.  This contention is unavailing because
the parties' interpretation of a statute does not bind us.  (See *Oakland
Raiders v. City of Berkeley* (1976) 65 Cal.App.3d 623, 629 ["interpretation of
the Constitution, statutes, and ordinances is a subject within the authority of
the courts, not the parties"].)

[7]    Section 1670.9, subdivision (a) states:  "A city, county, city and county,
or local law enforcement agency that does not, as of January 1, 2018, have a
contract with the federal government or any federal agency or a private
corporation to house or detain noncitizens for purposes of civil immigration

scope of existing contracts "with the federal government or any federal agency or a private corporation to detain noncitizens." (§ 1670.9, subd. (b).)[8] And subdivision (d) imposes certain public notice and hearing requirements before local governments may make certain land-use decisions regarding "the building or reuse of existing buildings *by any private corporation, contractor, or vendor* to house or detain noncitizens." (§ 1670.9, subd. (d), italics added.)[9] The plain language of these subdivisions shows the Legislature was concerned with certain local government actions regarding immigration detention facilities involving specific entities.

---

custody, shall not, on and after January 1, 2018, enter into a contract with the federal government or any federal agency or a private corporation, to house or detain in a locked detention facility noncitizens for purposes of civil immigration custody."

[8] Section 1670.9, subdivision (b) states: "A city, county, city and county, or local law enforcement agency that, as of January 1, 2018, has an existing contract with the federal government or any federal agency or a private corporation to detain noncitizens for purposes of civil immigration custody, shall not, on and after January 1, 2018, renew or modify that contract in a manner that would expand the maximum number of contract beds that may be utilized to house or detain in a locked detention facility noncitizens for purposes of civil immigration custody."

[9] Section 1670.9, subdivision (d) states: "A city, county, city and county, or public agency shall not, on and after January 1, 2018, approve or sign a deed, instrument, or other document related to a conveyance of land or issue a permit for the building or reuse of existing buildings by any private corporation, contractor, or vendor to house or detain noncitizens for purposes of civil immigration proceedings unless the city, county, city and county, or public agency has done both of the following: [¶] (1) Provided notice to the public of the proposed conveyance or permitting action at least 180 days before execution of the conveyance or permit. [¶] (2) Solicited and heard public comments on the proposed conveyance or permit action in at least two separate meetings open to the public."

12

In stark contrast, section 1670.9(c) makes "[a]ny *facility* that detains a noncitizen pursuant to a contract with a city . . . subject to the [CPRA]." (§ 1670.9(c), italics added.) If the Legislature had intended the CPRA to apply on an entity-specific basis, subdivision (c) would read more like its neighboring subdivisions. For example: "Any private corporation, contractor, or vendor that has a contract with a local government agency to house or detain noncitizens for purposes of civil immigration custody is subject to the CPRA." This approach focuses on the specific entities involved in detaining noncitizens, not the facilities at which they are detained. Because the Legislature eschewed this approach in subdivision (c) when it employed it in neighboring subdivisions, we must presume the Legislature intended that subdivision (c) be construed differently—on a facility-wide basis. (See *Kray Cabling Co. v. County of Contra Costa* (1995) 39 Cal.App.4th 1588, 1593 [" 'Where the same word or phrase might have been used in the same connection in different portions of a statute but a different word or phrase having different meaning is used instead, the construction employing that different meaning is to be favored.' "]; *American Nurses Assn. v. Torlakson* (2013) 57 Cal.4th 570, 585 ["The inescapable inference is that the Legislature, by using different words to define the two exceptions, intended them to have different meanings."].)

Our construction is also consistent with the requirement that we " 'avoid a construction that would produce absurd consequences, which we presume the Legislature did not intend.' " (*In re Greg F.* (2012) 55 Cal.4th 393, 406; see *City of San Jose*, *supra*, 2 Cal.5th at pp. 616-617.) Apart from being unsupported by the plain language of section 1670.9(c), Operator's proposed interpretation would lead to the absurd result of allowing a direct contracting party to shield an immigration detention facility from CPRA

13

scrutiny merely by inserting a contractual intermediary between the contracting party and the local government agency. The Legislature could not have intended that a statute enacted to enhance transparency could be so easily frustrated. (See *City of San Jose*, *supra*, 2 Cal.5th at p. 617 [the state constitution requires that a statute " 'be *broadly* construed if it furthers the people's right of access, and *narrowly* construed if it limits the right of access' "].)

Operator contends applying section 1670.9(c) on a facility-wide basis "provides no clear boundaries" such that it could theoretically apply to "every person or entity who stepped foot on the grounds"—"[e]very employee," "[e]very inmate," and "[e]very visitor." We are not persuaded. First, we need not determine how far down the slippery slope section 1670.9(c) reaches because if it applies to facilities *at all*, it certainly applies to Operator. The ICE–City Contract and the City–Owner Contract are "contract[s] with a city" "pursuant to" which the Facility "detains . . . noncitizen[s]." (§ 1670.9(c).) And although Operator was not a direct party to either of these contracts, it was the entity responsible for effectuating them. It did so with ICE's approval via the Owner–Operator Contract, which was subject to the terms and conditions of the ICE–City Contract, a copy of which was attached to the Owner–Operator Contract.

Similarly, the Owner–Operator Contract required Operator to use its best efforts to procure additional contracts between other governmental entities and the City to house detainees at the Facility. The City would subcontract these contracts to Owner, which, in turn, would subcontract them to Operator. Operator had the right to approve these contracts' terms, and to direct Owner to cause the City to execute them. Owner was

14

essentially a conduit through which detention contracts with the City would flow to Operator.

Thus, we disagree with Operator that "it would be a giant leap to suddenly apply the full brunt of the CPRA to a private entity that is not even under contract with a public agency, as is the case with [Operator]."

Second, and in any event, as with all CPRA requests, the courts are capable of determining the extent to which records not in a public agency's direct possession are subject to the CPRA. (See, e.g., *City of San Jose*, *supra*, 2 Cal.5th at pp. 620-621 [addressing work-related records on a public employee's private device]; *Anderson-Barker v. Superior Court* (2019) 31 Cal.App.5th 528, 540-541 [addressing records in a government contractor's possession].)

In sum, we conclude from the plain and commonsense meaning of section 1670.9(c), framed by section 1670.9 as a whole, that the Legislature intended for the CPRA to apply to immigration detention facilities on a facility-wide basis. Under this construction, we further conclude the CPRA applies to Operator in relation to the Facility, even though Operator did not have a direct contractual relationship with the City.

Operator maintains that even if it is subject to the CPRA, the trial court properly denied the petition either because Operator "does not have the requested records, Petitioner already has them, or exemptions under the CPRA apply." The trial court did not reach these fact-intensive claims, which we decline to address in the first instance. Operator may raise them on remand.

## III.  DISPOSITION

Let a writ of mandate issue directing the trial court to vacate its order denying Petitioner's petition and to enter a new order granting the petition, subject to the trial court resolving any CPRA exemption claims Operator may assert.  Real party in interest shall pay Petitioner's costs on appeal.

HALLER, Acting P. J.

WE CONCUR:


DATO, J.


GUERRERO, J.